IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　Plaintiff,<br>vs.<br><br>ROMEO MARELLE KUYKENDALL,<br>　　　　Defendant. | Case No. 22-cr-2046-LTS<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

_____

## I.　　INTRODUCTION

On September 20, 2022, the Grand Jury charged Defendant Romeo Marelle Kuykendall ("Defendant") with one count of Possession of Firearms by a Prohibited Person in violation of 18 U.S.C. Sections 922(g)(3) and 924(a)(2) and one count of Possession of a Stolen Firearm in violation of 18 U.S.C. Sections 922(j) and 924(a)(2). (Doc. 3.)

The matter before me is Defendant's motion to suppress. (Doc. 24). The motion contained an inventory of items to be suppressed which includes statements made by Defendant to Sergeant Woodward and other officers during questioning after a May 22, 2022 vehicle stop, statements made by Defendant to Detective Northup during an interview at the Waterloo Police Department on May 22, 2022, and Defendant's urine sample and test results. (Doc. 24 at 1-2.) The Government timely filed a response. (Doc. 30.) The Honorable Leonard T. Strand, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on December 28, 2022. (Doc. 28.)

1

The motion arises from statements made to law enforcement following a traffic stop and arrest on May 22, 2022.

At the hearing, the following Government exhibits were admitted without objection:

1. Sergeant Woodward body camera video;
2. Video of interview with Detective Northup;
3. Call for service record of 911 call;
4. Waterloo Police Department incident report and state charging documents;
5. Photo of vehicle with trunk open;
6. Photo of firearm magazine in vehicle;
7. Close up photo of firearm magazine in vehicle;
8. Photo of firearm in laundry bag;
9. Photo of small backpack with a bag a marijuana and THC cartridges;
10. Photo of purse with firearm inside;
11. Photo of loaded firearm;
12. Photo of small black firearm;
13. Photo of black and silver firearm;
14. Cedar Falls Police Department incident report;
15. Defendant's State of Iowa/Black Hawk County disorderly conduct charge; and
16. Waterloo Police Department supplemental incident report.

Defendant seeks to suppress statements made to law enforcement following the vehicle stop, statements made to law enforcement at the Waterloo Police Department, and Defendant's urine sample and test results. (Doc. 24 at 1-2.)

At the hearing, the following defense exhibits were admitted without objection:

A. Police Report (Doc. 26-1);
B. Sergeant Woodward body camera video;

C. Video of interview with Detective Northup;

E. Toxicology Report. (Doc. 26-2.)

The Government called three witnesses: Sergeant Matthew Woodward, Detective Keaton Northup, and Officer Preston Russell. I found all witnesses credible. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II. FINDINGS OF FACT

### A. *May 22, 2022 Vehicle Stop*

On May 22, 2022, law enforcement received a 911 call reporting an issue at a residence on Hammond Avenue in Waterloo, Iowa. Defendant's mother reported that Defendant had been using drugs and fired a gun inside the residence. Officers were dispatched to the residence where Defendant's mother told them that: (1) Defendant was high and abusing his medication; (2) Defendant was in possession of a firearm; and (3) Defendant had fired off one round inside the house. Defendant's mother advised the officers that Defendant had left the house with the firearm. Further, Defendant's mother stated that Defendant went with his father, and they were traveling in his father's vehicle, a two-door black Monte Carlo.

Sergeant Matthew Woodward was in a patrol car with another officer when they heard over the radio that a black Monte Carlo had been observed by other officers. Sergeant Woodward and the other officer then proceeded to Ridgeway Avenue and conducted a traffic stop on the vehicle.[1] The Monte Carlo matched the description of the vehicle reported by Defendant's mother and was registered to Ramone Williams, Defendant's father. Mr. Williams was the driver of the vehicle and his girlfriend,

---

[1] Sergeant Woodward is employed by the Waterloo Police Department. He is a patrol supervisor and also assigned to the Safe Streets FBI Task Force. He has been a police officer since 2012.

3

Jacqueline Porter, was in the front passenger seat. Defendant was in the back seat of the vehicle. All three individuals were ordered out of the car.

Defendant was ordered to put his hands in the air after exiting the vehicle. Defendant complied. Once out of the vehicle, Sergeant Woodward directed Defendant to lift the top of his shirt and turn in a circle to permit a visual inspection for any weapons in his waistband or pockets. Defendant complied and then was told to walk backwards, 25 to 30 feet, to the patrol car.[2] Again, Defendant complied with Sergeant Woodward's orders. Defendant was taken into custody without incident and placed in handcuffs.

Sergeant Woodward noticed the smell of unsmoked, raw, fresh marijuana emanating from Defendant. Another officer searched Defendant but found no marijuana on his person. However, due to the odor of marijuana, Sergeant Woodward asked Defendant whether he was in possession of marijuana. Defendant denied having any marijuana on his person. While they were talking, Defendant attempted to adjust his pants (Defendant was handcuffed with his hands behind his back) and Sergeant Woodward asked Defendant whether he had marijuana in the crotch or seat of his pants, a common place to hide drugs to prevent detection. A pill, later identified by lab personnel as similar to Xanax, was also found in the front left pocket of Defendant's jacket.

After searching Defendant and inquiring whether he was in possession of marijuana, Sergeant Woodward asked Defendant generally about what going on between him and his mother. At approximately 12:07 p.m., Sergeant Woodward read Defendant his *Miranda* rights. (Def. Exhibit B at 17:36-17:57.) Defendant nodded his acknowledgement and said "uh-huh" that he understood his rights. (*Id.*; Woodward Hr'g Test. at 14.) Sergeant Woodward questioned Defendant about his drug use. Initially,

---

[2] Sergeant Woodward noted that Defendant had no difficulty walking backwards with his hands in the air. (Woodward Hr'g Test. at 8.)

Defendant denied using any drugs, but later admitted using marijuana and Xanax the day before. (Woodward Hr'g Test. at 13.) Sergeant Woodward also asked Defendant about the firearm and whether Defendant had discharged it at his mother's house. (*Id.* at 14-15.) Defendant responded that one round accidently went off and hit the floor. (*Id.* at 15; Def. Exhibit B at 19:06-19:40.) Defendant indicated that he did not have the firearm in his possession and that a friend had picked it up at his mother's house. Then, Defendant stated that he had put the firearm in the trash/dumpster at a nearby apartment complex. (*Id.*; Def. Exhibit B at 19:43-21:08.) After this discussion, Defendant was placed in the back of a patrol car.

The vehicle was searched. Officers found two firearms and a firearm magazine. (Govt. Exhibits 6-8, 11-13.) One of the firearms was found in a hamper containing Defendant's clothes in the trunk of the car. The other firearm was found in Ms. Porter's purse. (Woodward Hr'g Test. at 23.) After the firearms were discovered, Mr. Williams told Sergeant Woodward that Defendant told him that Defendant had placed the firearm in Ms. Porter's purse.[3] (*Id.* at 24; Def. Exhibit B at 41:24-41:36.) Sergeant Woodward questioned Defendant further regarding the firearms. Initially, Defendant denied that the firearms were his, but later admitted that both firearms belonged to him, including the magazine. Defendant also admitted placing one of the firearms in Ms. Porter's purse. (*Id.* at 23-24; Def. Exhibit B at 41:43-42:57.) Defendant indicated that he purchased both firearms off the street for $300 and $700 respectively. (*Id.* at 26.)

**B.** *May 22, 2022 Interview with Defendant at Waterloo Police Department*

Following the traffic stop, Defendant was transported to the Waterloo Police Department. At approximately 1:19 p.m., Defendant was interviewed by Detective

---

[3] Mr. Williams was permitted to speak with Defendant through the patrol car window while Defendant was seated in the back of the patrol car.

Keaton Northup.[4]  The interview took place in a Waterloo Police Department interview room.  During the interview, Defendant was not handcuffed and the door to the interview room was closed.  Detective Northup did not read Defendant his *Miranda* rights in the interview room.  However, Detective Northup stated that he was aware that Sergeant Woodward had read Defendant his *Miranda* rights and that Defendant understood his rights.  (Northup Hr'g Test. at 54.)  Detective Northup asked Defendant for a urine specimen.  Defendant agreed to give a urine specimen.  (*Id*. at 50-51; Def. Exhibit C at 5:03-5:35.)  The interview lasted approximately seven minutes.  (*Id*. at 51.)

### III. DISCUSSION

#### A. *The Parties' Arguments*

Defendant argues that he did not knowingly and intelligently waive his *Miranda* rights.  (Doc. 29 at 4-6.) Defendant points out that, "[a]t the time of his alleged waiver of rights, [he] was still under the influence of both marijuana and benzodiazepines." (*Id*.) Defendant also points out that Sergeant Woodward acknowledged in his report that Defendant appeared to be under the influence of drugs.[5] (*Id*.; Def. Exhibit A.)  Defendant also asserts that his age (18) and his limited criminal history and interaction with law enforcement weigh against a finding that he knowingly and intelligently waived his rights. (Doc. 29 at 6.)

Defendant also argues that his "statements were invalid under the totality of the circumstances." (*Id*.)  Defendant maintains that incriminating statements that he made

---

[4] Detective Northup is a 2014 graduate of the Iowa Law Enforcement Academy.  He has been employed with the Waterloo Police Department since 2016.  He began his employment as a police officer in the patrol unit and is now a detective assigned to the Violent Crime Apprehension Team.

[5] Sergeant Woodward's report states: "It should be noted that when speaking with [Defendant] he appeared to look and act 'strung out' as if he was under the influence of pills or a heavier drug besides marijuana. [Defendant's] speech was slow, slurred and had a dazed and confused look on his face. [He] had dry crusted lips and his facial appearance he looked 'ruff' as in he looked as if he had been using drugs from my training and experience." (Def. Exhibit A at 1.)

regarding his drug use and firearm possession were involuntary. (*Id.* at 7.) Specifically, Defendant asserts that his statements were involuntary because he was under the influence of drugs. (*Id.*) Defendant also contends that Sergeant Woodward employed "some tactics that appear to be designed to exert pressure on [him] to make incriminating statements." (*Id.*) For example, Defendant points out that Sergeant Woodward told him: (1) Mr. Williams was a felon, and Defendant did not want to get his father in trouble; (2) Ms. Porter was crying and emotional regarding the firearm found in her purse; and (3) Defendant was 18 years old and needed to take responsibility for his actions. (*Id.*)

Finally, Defendant argues that his consent to provide a urine sample was invalid. (*Id.* at 8.) Specifically, Defendant asserts that, based on the totality of the circumstances, his consent was involuntary. (*Id.* at 8-9.)

The Government argues that Defendant's *Miranda* rights were knowing and intelligently waived. (Doc. 30 at 5-11.) The Government also argues that Defendant's statements were voluntary. (*Id.* at 11-15.) Finally, the Government asserts that Defendant's consent to provide a urine sample was voluntary. (*Id.* at 16-18.)

### B.  Relevant Law

"The Fifth Amendment requires that Miranda warnings be given when a person is interrogated by law enforcement after being taken into custody." *United States v. Sandell*, 27 F.4th 625, 628 (8th Cir. 2022) (quoting *United States v. Parker*, 993 F.3d 595, 601 (8th Cir. 2021), in turn quoting *United States v. Giboney*, 863 F.3d 1022, 1027 (8th Cir. 2017)). "A person is considered to be in custody for purposes of Miranda warnings when there is a 'formal arrest or restraint [on his or her] freedom of movement of the degree associated with formal arrest.'" *Sandell*, 27 F.4 th at 628-29 (alteration in original) (quoting *Parker*, 993 F.3d at 601, in turn quoting *United States v. Williams*, 760 F.3d 811, 814 (8th Cir. 2014)). Interrogation "refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating

7

response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

The Government bears the burden to prove a waiver of these rights by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). To make this determination, courts consider the following personal characteristics of the defendant:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*United States v. Griffith*, 533 F.3d 979, 984 (8th Cir. 2008) (quoting *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000) (internal citation omitted).

A valid *Miranda* waiver must also be voluntary, knowing, and intelligent. *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). A voluntary waiver is the product of "free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)). A waiver is knowing and intelligent if it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Simply being "under the influence of drugs does not automatically render [a] confession involuntary. Rather, [a defendant] must show his [or her] intoxication caused his [or her] will to be *overborne*." *United States v. Howard*, 532 F.3d 755, 763 (8th Cir. 2008) (emphasis in original) (citing *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990)); *see also United States v. Korn*, 138 F.3d 1239, 1240 (8th Cir. 1998) ("[N]either exhaustion nor intoxication will necessarily invalidate a *Miranda* waiver"); *United States v. Goodwin*, 242 F.3d 377, 2000 WL 1852624, at *1 (8th Cir. 2000) (per curiam) (unpublished table

8

decision) (declining to adopt "a per se rule that a *Miranda* waiver made under the influence of drugs is involuntary").

"A statement is involuntary when it is extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Sandell*, 27 F.4th at 630 (quoting *United States v. Roberts*, 975 F.3d 709, 718 (8th Cir. 2020)). In determining whether a defendant's will has been overborne, courts examine the totality of the circumstances, "'including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure.'" *Id*. (quoting *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021)). Factors for making this determination include "'the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition.'" *Magallon*, 984 F.3d at 1284 (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)). "A statement is not considered involuntary unless 'the police extorted it from the accused by means of coercive activity.'" *Vinton*, 631 F.3d at 482 (quoting *Jenner v. Smith*, 982 F.2d 329, 333 (8th Cir. 1993)). "[T]actics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices," do not "render a confession involuntary . . . unless 'the overall impact of the interrogation caused the defendant's will to be overborne.'" *Magallon*, 984 F.3d at 1284 (quoting *United States v. Brave Heart*, 397 F.3d 1035, 1041 (8th Cir. 2005), in turn quoting *Jenner*, 982 F.2d at 334).

In *United States v. Johnson*, No. 13-CR-7 (MJD/LIB), 2013 WL 1435291 (D. Minn. Mar. 7, 2013), the district court reviewed the law for voluntary consent to obtain blood and urine samples:

9

> "An officer with consent need neither a warrant nor probable cause to conduct a constitutional search.'" *United States v. Pennington*, 287 F.3d 739, 746 (8th Cir. 2000). "Whether or not the consent was voluntary must be established by examining the totality of the circumstances, including both the characteristics of the accused and the details of the interrogation." *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir.2000) (quotations and citations omitted). In the Eighth Circuit:
>
>> We consider the following characteristics of the individual to determine whether their consent was truly voluntary: age, intelligence, intoxication, advice of *Miranda* rights, and previous arrests. We also consider the following characteristics of the environment in which the individual's consent was given, so as to determine whether their consent was truly voluntary: length of detention, threats and misrepresentations by police, whether the individual is in custody or under arrest, whether it is a public or private place, and the suspect's contemporaneous objections and representations.
>
> *United States v. Reinholz*, 245 F.3d 765, 780 (8th Cir.2001) (citations omitted), cert. denied 534 U.S. 896 (2001). . . .
>
> "[T]he question of whether a consent to search was in fact 'voluntary' or was the product of duress or coercion . . . is a question of fact to be determined from the totality of all circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *see also United States v. Fleck*, 413 F.3d 883, 891–92 (8th Cir.2005).

*Johnson*, 2013 WL 1435291, at *8; *see also United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000) ("Consent is voluntary if it was the product of an essentially free and unconstrained choice by its maker, . . . rather than the product of duress or coercion, express or implied.") (Quotations and citation omitted).

*C.   Analysis*

   *1.   Miranda Waiver*

Defendant principally argues that his *Miranda* waiver was not knowingly or intelligently made because at the time Sergeant Woodward read Defendant his *Miranda* rights, he was under the influence of marijuana and benzodiazepines. (Doc. 29 at 5.) As noted above, drug intoxication does not "necessarily invalidate a *Miranda* waiver." *Korn*, 138 F.3d at 1240. In *United States v. Turner*, 157 F.3d 552 (8th Cir. 1998), the defendant argued that he did not knowingly and intelligently waive his *Miranda* rights due to a low I.Q. and PCP use. *Id*. at 554. The Eighth Circuit rejected the defendant's argument:

> As to his intelligence, although Turner's I.Q. was in the low-average to borderline range, he was clearly intelligent enough to understand his rights. [The officer] testified that [the defendant] was cooperative, reviewed and initialed each admonition of the waiver form, agreed to answer questions, and gave accurate information, including the name and telephone number of the owner of the car. In addition, as the government notes, at the time he was stopped, [the defendant] acted in a manner more consistent with a person attempting to avoid being caught than a person who did not know what he was doing. For example, [the defendant] denied consuming alcohol, but refused to answer questions about drugs and gave a false name.
>
> As to PCP intoxication, we decline to adopt a per se rule when confronted with intoxication. Even if [the defendant] was intoxicated by PCP at the time of his confession, as just discussed, the evidence shows that he understood his rights and knowingly waived them. In addition, although [the defendant] later exhibited "bizarre" behavior and may have exhibited signs of mental illness, the change in behavior does not show that at the time of his confession he lacked the mental capacity to waive his rights.

*Id*. at 555-56 (quotations and citations omitted).

Here, Defendant was 18 years old at the time of questioning. There is no evidence that Defendant has low intelligence. He attended some high school. Defendant admitted

11

using marijuana and taking a prescribed Xanax pill the day before his encounter with law enforcement. Sergeant Woodward noted that Defendant appeared to be on drugs. However, after reading Defendant his *Miranda* rights, Sergeant Woodward observed that Defendant appeared to understand his rights, Defendant was able to understand the questions Sergeant Woodward asked him, Defendant communicated effectively with Sergeant Woodward, and Defendant was able to answer all of Sergeant Woodward's questions. (Woodward Hr'g Test. at 14.) Sergeant Woodward also noted that during questioning Defendant made admissions and denials and spoke coherently. (*Id*. at 19.) Further, Sergeant Woodward indicated that Defendant properly followed commands and did not have trouble walking backwards when he was first ordered out of the Monte Carlo. (*Id*. at 17-19.)

Under such circumstances, I find that Defendant's drug use did not cause his will to be overborne. *See Howard*, 532 F.3d at 763. Further, Defendant spoke with law enforcement after being advised of his *Miranda* rights. *See Berghuis v. Thompkins*, 560 U.S 370, 386 (2010) (providing that when a defendant has been advised of his or her *Miranda* rights, does not sign a waiver of rights or verbally waive his or her rights, but proceeds to voluntarily answer questions from law enforcement, he or she has engaged in a "course of conduct indicating waiver" of his or her right to remain silent) (citation omitted); *see also United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997) (holding that defendant waived his Sixth Amendment rights by electing to answer officer's questions after being *Mirandized*) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *United States v. Chartier*, No. CR13-0018, 2013 WL 5719483, at *11 (N.D. Iowa Aug. 16, 2013) (holding that defendant waived his right to remain silent by making "knowing, voluntary statements" to police officer after receiving *Miranda* warning), R. & R. adopted as modified, 2013 WL 5719482 (N.D. Iowa Oct. 21, 2013) (this issue not addressed in objections to R. & R.), aff'd, 772 F.3d 539 (8th Cir. 2014). Defendant had

12

also been read his *Miranda* rights in the past in connection with an interview following a vehicle stop in August 2021. (Govt. Exhibit 14 at 7; Russell[6] Hr'g Test. at 58-60.) Finally, Defendant does not argue and presents no evidence of intimidation, coercion, or deception related to his waiver of *Miranda* rights. Accordingly, based on the totality of the circumstances, I find that Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights.[7]

### 2. Were Defendant's Statements Voluntary?

Defendant argues that his statements were involuntary because he was under the influence of drugs and because Sergeant Woodward used "tactics that appear[ed] to be designed to exert pressure on [Defendant] to make incriminating statements." (Doc. 29 at 7.)

I find that Defendant's statements were voluntary. Here, there is no evidence of police coercion. There is no evidence that Sergeant Woodward or Detective Northup extracted information from Defendant using threats, violence, or promises. *See Sandell*, 27 F.4th at 630. Even though Sergeant Woodward pointed out to Defendant during

---

[6] Preston Russell, a patrol office with the Cedar Falls Police Department, testified at the suppression hearing regarding the August 2021 traffic stop and subsequent post-*Mirandized* interview with Defendant at the Cedar Falls Police Department.

[7] Defendant does not appear to directly argue the point in his brief, but to the extent that Defendant asserts that the waiver of his *Miranda* rights during the traffic stop did not extend to Detective Northup's interview at the Waterloo Police Depart about an hour after he initially waived his *Miranda* rights, such an argument is misplaced. *See United States v. Boyd*, 180 F.3d 967, 977 (8th Cir. 1999) (holding that a one and one-half hour to two-hour delay between having been given *Miranda* rights and questioning does not render a *Miranda* waiver invalid and law enforcement is not required to readvise a defendant of his or her *Miranda* rights); *see also United States v. Ferrer-Montoya*, 483 F.3d 565, 569-70 (8th Cir. 2007) (finding that a one-hour delay between *Miranda* warnings and questioning does not affect waiver when a defendant is in custody the entire time without asserting his or her *Miranda* rights and there is no evidence of coercive conduct on the part of law enforcement). Accordingly, I find that Defendant's waiver of *Miranda* rights was sufficient for both the questioning following the traffic stop and the questioning about an hour later at the Waterloo Police Department.

13

questioning that: (1) Defendant's father was a felon, and Defendant did not want to get his father in trouble; (2) Ms. Porter was crying and emotional regarding the firearm found in her purse; and (3) he was 18 years old and needed to take responsibility for his actions, such tactics do not render Defendant's confession involuntary because the overall impact of such tactics did not cause Defendant's will to be overborne. *See Magallon*, 984 F.3d at 1284. The interviews with Sergeant Woodward and Detective Northup were not coercive, and the length of the interrogations were relatively short (approximately fifteen minutes and seven minutes, respectively). The questioning took place out-of-doors following the traffic stop and at the Waterloo Police Department, this factor does not weigh heavily against the voluntariness of the statements made by Defendant during questioning. There is no evidence of Defendant's physical or mental condition being impaired or Defendant lacking the requisite maturity and intelligence for the statements made at the interviews to not be voluntary. *See id*. As discussed above, Defendant admitted using marijuana and taking a Xanax pill the day before, but he was able to follow Sergeant Woodward's commands, walk backwards, communicate effectively and coherently with law enforcement officers, answer questions from law enforcement officers, make admissions and denials, and he understood his *Miranda* rights. (Woodward Hr'g Test. at 14, 17-19.) For these reasons, Defendant's use of drugs does not weigh heavily against the voluntariness of his statements. Therefore, based on the totality of the circumstances, I find that Defendant's statements in the interviews with Sergeant Woodward and Detective Northup on May 22, 2022 were voluntary.

### 3. *Consent to Provide Urine Sample*

Considering the factors outlined in *Johnson*, I find that Defendant's consent to provide law enforcement with a urine sample was voluntary. Defendant was 18 years old. There is no evidence that Defendant is of below average intelligence, and he attended some high school. While Defendant admitted to using drugs prior to the traffic stop, as

14

discussed above, Defendant was able to follow commands, walk backwards, communicate effectively, answer questions, make admissions and denials, and speak coherently with law enforcement officers. Thus, Defendant's use of drugs does not weigh heavily against the voluntariness of his consent to provide a urine sample. Defendant was advised of his *Miranda* rights prior to giving consent. He had experience with law enforcement and had previously been given his *Miranda* rights prior to questioning at the Cedar Falls Police Department in August 2021. (Govt. Exhibit 14 at 7; Russell Hr'g Test. at 58-60.) Here, Defendant had been detained for about two hours. There is no evidence of any threats or misrepresentations by law enforcement, particularly by Detective Northup who requested the urine sample. Detective Northup spoke with Defendant in a private Waterloo Police Department interview room for approximately seven minutes.[8] Defendant was in custody, but not handcuffed, and, both when Detective Northup was in the interview room and when he was not in the interview room, Defendant had full freedom of movement. Defendant did not appear under any coercion, nor did he appear to be intoxicated, manic, or lethargic. Rather, Defendant appeared to behave coherently during the time he was left alone in the interview room. He appeared to examine the contents of the drawers of the desk, tried to access the computer on the desk, and appears to have made a telephone call to someone from a desk phone. Under these circumstances, I do not find that the length or conditions of detention or the place where the interview was held to be coercive. Defendant made no objections to the request for the urine sample. Accordingly, based on the totality of the circumstances, I find that Defendant's consent to provide a urine sample was voluntary.

---

[8] Defendant was in the interview room for approximately 30 minutes, but Detective Northup was in the room with him for only approximately seven minutes. (Def. Exhibit C at 2:52-5:38, 7:22-12:14.) When Detective Northup was not in the room, Defendant was alone and had full freedom of movement in the interview room. (*Id.* at 12:14-29:49.)

15

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 24.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 8th day of February, 2023.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa